1

2

3

4

5

6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7

DEJAVUAI INC.,

CASE NO. 2:25-cv-00915-JNW

8

                          Plaintiff,

PRELIMINARY INJUNCTION

9

          v.

10

11

FYODOR KAPUSTIN also known as
TED also known as FYODOR
KAPUSTINE,

12

                          Defendant.

13

14

15

## 1. INTRODUCTION

16

     This case concerns an ownership dispute over artificial intelligence-powered

image recognition software and alleged trade secret misappropriation. Defendant

17

Fyodor Kapoustine,[1] a Canadian software developer, claims individual ownership of

18

the DejaVuAI technology based on his original prototype, while Plaintiff DejaVuAI,

19

Inc. asserts ownership through agreements executed when the parties restructured

20

their business relationship between 2020 and 2022. Following Kapoustine's

21

22

23

[1] The record contains various spellings of Defendant's surname, including
"Kapustin," "Kapoustine," and "Kapustine." The Court refers to Defendant using the
spelling "Kapoustine," as it appears in his sworn declarations. *See* Dkt. Nos. 43, 60

termination as Chief Technology Officer and resignation from DejaVuAI's board, he began competing using the disputed technology, prompting this litigation. The Court issued a temporary restraining order based on breach of fiduciary duties, but Kapoustine's board resignation has shifted the legal focus to trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"). The central question now before the Court is whether to convert the temporary restraining order to a preliminary injunction prohibiting Kapoustine from using the technology pending resolution of the underlying ownership dispute.

## 2. BACKGROUND

### 2.1 Kapoustine and Kessler founded 1st1 Technologies LLP in 2020 to commercialize Kapoustine's image recognition prototype.

In June 2020, Kapoustine and his business partner Johnny Kessler co-founded 1st1 Technologies LLP ("1st1") to develop and sell software based on a prototype image recognition program that Kapoustine previously created. Dkt. No. 47 ¶ 3; Dkt. No. 47-1. The parties executed an Operating Agreement that acknowledged Kapoustine as the owner of the foundational technology while establishing a framework for future development and commercial activities. Dkt. No. 47-1 at 1.

The Operating Agreement detailed each partner's responsibilities: Kapoustine would handle software development while Kessler managed business development and sales. *Id.* at 1–2. Over the next two years, the partnership operated according to plan. Kessler managed business operations, securing sales

1
2

contracts and finding investors, while Kapoustine developed new versions of the

software for the partnership. Dkt. No. 47 ¶ 4.

3
4

**2.2    The parties incorporated DejaVuAI Inc. in 2022 and executed comprehensive agreements transferring rights and establishing employment relationships.**

5
6
7
8
9
10

By 2022, Kapoustine and Kessler determined that corporate restructuring would spur outside investment.  In September 2022, they incorporated DejaVuAI, Inc. ("DejaVuAI") in Washington, transferring substantially all 1st1 Technologies' assets and operations to the new entity. Dkt. No. 47 ¶¶ 13–15. This restructuring involved three critical sets of agreements that now form the basis of the ownership dispute.

11
12
13
14
15
16
17

First, the parties executed a License Agreement between 1st1 Technologies, as licensor, and DejaVuAI, as licensee, signed September 1, 2022.[2] Dkt. No. 47-5. The License Agreement granted DejaVuAI extensive rights to the software and established that DejaVuAI would own any improvements or updates to the licensed software.

18
19
20
21
22
23

---

[2] The authenticity of Kapoustine's signature on this License Agreement is disputed, but the documentary evidence strongly supports its validity. Kessler's declaration describes the signing process in detail—Kapoustine requested "the exclusive license agreement" via text message, Kessler emailed him a copy, Kapoustine asked clarification questions about signing procedures, and then transmitted the signed agreement to DejaVuAI's counsel. Dkt. No. 65 ¶ 8, Exs. B–D. Moreover, the License Agreement is cross-referenced in multiple other contracts that Kapoustine acknowledges as authentic, including the Common Stock Purchase Agreement, which specified that 1st1's consideration for DejaVuAI shares included "entering into that certain Exclusive License Agreement." Dkt. No. 47-6 § 1.

Second, Kapoustine and Kessler signed employment contracts with DejaVuAI, designating themselves as the company's Chief Technology Officer and Chief Executive Officer, respectively. Dkt. No. 47-8 at 93. Kapoustine's contract specified that he "w[ould] be employed on a full-time basis by DejaVuAI Inc. as Chief Technology Officer" and would be responsible for "oversee[ing] all activities related to technology development, specifically the application of the company's central product, DejaVuAI." *Id*.

The execution of these employment agreements occurred against the backdrop of Kapoustine's immigration status as a Canadian citizen requiring work authorization. In June 2022, 1st1 Technologies filed an O-1 visa petition on Kapoustine's behalf, which USCIS approved in March 2023. Dkt. No. 43 ¶ 10; Dkt. No. 47-8. After DejaVuAI's incorporation, the companies notified USCIS of the corporate restructuring, and USCIS approved DejaVuAI as Kapoustine's petitioning employer. Dkt. No. 47 ¶ 17; Dkt. No. 47-10.

Third, Kapoustine and Kessler signed Proprietary Information And Invention Assignment Agreements ("PIIAAs") with DejaVuAI. Dkt. No. 47 ¶ 16; Dkt. No. 47-7. These agreements contained critical provisions that bear directly on the current ownership dispute. Under his PIIAA, Kapoustine agreed that "all inventions, original works of authorship, developments, concepts, know-how, improvements or trade secrets which are made by me (solely or jointly with others) within the scope of and during the period of my Relationship with the Company are '***works made for hire***' (to the greatest extent permitted by applicable law) and are compensated by my salary…." Dkt. No. 47-7 at 3–4 (emphasis in original).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

The PIIAA required Kapoustine to disclose any "Prior Inventions" that he owned before joining DejaVuAI and wished to exempt from assignment to the company. *Id*. at 3, 9. These agreements contained provisions requiring assignment of work-related inventions to DejaVuAI and mandating disclosure of any "Prior Inventions" that would be exempt from such assignment. [3]

### 2.3     Kapoustine's and Kessler's falling out.

From 2022 through early 2024, the corporate structure functioned as intended. Kapoustine served as DejaVuAI's CTO and continued developing software for the company, creating what Kessler describes as "versions that were significantly more stable and functional and solved many issues like memory leaks by 'refactoring' the software multiple times." Dkt. No. 65 ¶ 4. But disputes began emerging in 2024 over intellectual property rights to DejaVuAI technology.

According to DejaVuAI, Kapoustine began claiming that he individually owned the technology and that DejaVuAI was distributing software without proper authorization. Dkt. No. 5 at 4. Kapoustine maintains a different version of events, arguing that Kessler began misrepresenting to customers that DejaVuAI was the developer of the technology and the successor to 1st1 Technologies. Dkt. No. 42 at 6.

---

[3] Additionally, under the PIIAA's express terms, if Kapustin ever "incorporate[d] . . . a Prior Invention owned by [him] or in which [he] ha[d] an interest" into a DejaVuAI product, process, or machine, then DejaVuAI would gain "a non-exclusive, royalty-free, irrevocable, perpetual, worldwide license (with the right to sublicense) to make, have made, copy, modify, make derivative works of, use, sell and otherwise distribute such Prior Invention as part of or in connection with such product, process or machine." *Id*. at 3.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

The disputes escalated significantly in early 2025. According to Kapoustine, the conflict intensified when Kessler sought to commercialize "not just the executable software," but also "the source code and the proprietary algorithms themselves." *Id*. Internal company discussions during this period included consideration of alternative licensing arrangements, but these negotiations did not resolve the underlying ownership dispute. Dkt. No. 64 at 8.

The relationship reached a breaking point in February 2025. Following what Kapoustine describes as a "contentious board meeting," Dkt. No. 42 at 7, Kessler disabled Kapoustine's work email on February 5, 2025, Dkt. No. 43 ¶¶ 26–27. DejaVuAI then sent Kapoustine both a termination letter and a demand letter requiring him to return the source code. *Id*. However, Kapoustine remained a director of DejaVuAI despite his employment termination, creating an unusual situation where he retained board authority while his employment relationship had ended. *Id*. ¶¶ 27–29.

DejaVuAI claims that Kapoustine began misusing his knowledge of its confidential business information to contact numerous current and prospective customers and investors, urging them to cut ties with DejaVuAI and soliciting them for his competing business. DejaVuAI also claims that Kapoustine both harassed DejaVuAI employees through email and social media, and that he encouraged them to quit and join his competing venture. *See, e.g.*, Dkt. No. 13.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

**2.4    Procedural background.**

This litigation began on May 16, 2025, when DejaVuAI moved for a TRO against Kapoustine. Dkt. Nos. 5 (sealed); 10 (redacted version). At that time, Kapoustine was a DejaVuAI Board member. DejaVuAI argued Kapoustine was "not only exploiting DejaVuAI's proprietary software source code to compete with the Company, but also specifically targeting DejaVuAI's customers, employees, resellers, vendors, and investors in a deliberate effort to damage or even destroy the Company." Dkt. No. 1 at 2. DejaVuAI's complaint asserts claims for breach of fiduciary duties, tortious interference with contracts and business expectancy, breach of contract, and misappropriation of trade secrets under 18 U.S.C. § 1836(b)(1). *Id.* ¶¶ 10–15.

The Court granted the TRO on May 22, 2025, finding that DejaVuAI was likely to succeed on its breach of fiduciary duties claim and that the company faced irreparable harm absent preliminary relief. Dkt. No. 21. The TRO enjoined Kapoustine from competing with DejaVuAI and from various forms of interference with the company's business relationships. *Id.* The Court ordered Kapoustine to show cause why the TRO should not convert to a preliminary injunction. *Id.*

On June 17, 2025, while the Court's show-cause proceedings were pending, Kapoustine resigned from DejaVuAI's Board of Directors via email to the company's counsel. Dkt. No. 48-1. However, when asked whether he was also withdrawing from 1st1 Technologies management, Kapoustine clarified, "I am not resigning from 1st1 Technologies, LLP yet." *Id.*

1       The current procedural posture of this case reflects its complexity. After
2   granting the TRO and ordering Kapoustine to show cause why it should not be
3   converted to a preliminary injunction, the Court extended deadlines to allow
4   Kapoustine to obtain new counsel after his attorney's withdrawal. On August 4,
5   2025, before the Court ruled on the TRO conversion, DejaVuAI filed the present
6   auxiliary motion for preliminary injunction. Dkt. No. 53. DejaVuAI explained that
7   while it believed its opposition to Kapoustine's show-cause response provided
8   sufficient grounds for conversion, it filed the auxiliary motion "in abundance of
9   caution to ensure the legal issues supporting its requested relief are properly
10  presented."[4] *Id*. at 1.

11      Despite the extensive factual disputes underlying this case, the scope of the
12  current disagreement is relatively narrow. Kapoustine "does not oppose extending
13  the TRO provisions into a preliminary injunction that prohibits him from contacting
14  those identified contacts in the TRO whom [he] became aware of by virtue of his
15  former directorship with Plaintiff; nor does he oppose the continuation of the TRO
16  provisions that would prohibit him from disparaging Plaintiff or interfering with
17  Plaintiff's business operation." Dkt. No. 42 at 2. However, he contests "Plaintiff's
18  request to enjoin Mr. Kapoustine's lawful competition with Dejavuai Inc." *Id*.

19

20  _____

21  [4] DejaVuAI notes the unusual procedural nature of its new motion for a preliminary
    injunction and acknowledges that the Court may consolidate it with the pending
22  conversion of the TRO. Dkt. No. 53 at 1 n.1. The Court viewed this as consent to
    extend the TRO until it decided the motion for preliminary injunction. Kapoustine
    also consented to extend the TRO so that the Court could consolidate these
23  proceedings.

PRELIMINARY INJUNCTION - 8

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

## 3.  DISCUSSION

### 3.1    Legal standard.

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). "The proper legal standard for preliminary injunctive relief requires a party to demonstrate (1) 'that he is likely to succeed on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.'" *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) (citing *Winter*, 555 U.S. at 20). These four factors—the *Winter* factors—apply whenever a preliminary injunction is sought. *Winter*, 555 U.S. at 20; *see All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th Cir. 2011) ("a showing on all four prongs" is required).

The Ninth Circuit takes a "sliding scale" approach to preliminary relief, under which "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiffs can support issuance of a preliminary injunction, so long as the plaintiffs also show that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Fraihat v. U.S. Immigr. & Customs Enf't*, 16 F.4th 613, 635 (9th Cir. 2021) (citation modified). This approach allows a stronger showing of one *Winter* factor to offset a weaker showing of another. *Planned Parenthood Great Nw., Hawaii, Alaska, Indiana, Kentucky v. Labrador*, 122 F.4th 825, 843–44 (9th Cir. 2024).

1

2

**3.2    DejaVuAI is likely to succeed on its DTSA claim.**

Kapoustine argues that he individually owns the DejaVuAI technology and

that DejaVuAI lacks standing to assert trade secret claims against him. DejaVuAI

contends that it owns the technology through agreements executed between 2020

and 2022. Resolution of this ownership dispute is key to determining whether

DejaVuAI is likely to succeed on its Defend Trade Secrets Act ("DTSA") claim.

"To succeed on a claim for misappropriation of trade secrets under the DTSA,

a plaintiff must prove: (1) that the plaintiff possessed a trade secret; (2) that the

defendant misappropriated the trade secret; and (3) that the misappropriation

caused or threatened damage to the plaintiff." *InteliClear, LLC v. ETC Glob.*

*Holdings, Inc.*, 978 F.3d 653, 657–58 (9th Cir. 2020). "[A]s part of [Plaintiff's] prima

facia case, it must show either that it developed the trade secret at issue or

otherwise [has] lawful possession of it." *BlueEarth Biofuels, LLC v. Hawaiian Elec.*

*Co., Inc.*, CIV. No. 09–00181, 2011 WL 2116989, at *21 (D. Hawai'i May 25, 2011)

(quoting *DTM Rsch., LLC v. AT & T Corp.*, 245 F.3d 327, 331 (4th Cir.2001)).

Thus, if DejaVuAI does not have lawful possession of the trade secret at

issue, then it lacks standing to pursue a DTSA claim.[5] *BlueEarth Biofuels, LLC*,

2011 WL 2116989, at *21.

---

[5] While Kapustin argues that the source codes and algorithms for DejaVuAI products are not *DejaVuAI's trade secrets*, he does not dispute that such source codes and algorithms may constitute trade secrets under the law. As the Parties seem to agree on this point, the Court does not delve into it.

### 3.2.1    The contractual framework establishes DejaVuAI's ownership of the technology.

The Parties' rights are governed by three interconnected agreements executed between 2020 and 2022: (1) the 1st1 Technologies LLP Operating Agreement, (2) the License Agreement between 1st1 and DejaVuAI, and (3) Kapoustine's Proprietary Information and Invention Assignment Agreement with DejaVuAI. Each agreement builds on the previous one to establish a clear chain of ownership from Kapoustine's original prototype to DejaVuAI's current technology.

The Parties agree that the contracts are governed by Washington law. Under Washington law, "the touchstone of contract interpretation is the parties' intent." *Tanner Elec. Co-op. v. Puget Sound Power & Light Co.*, 911 P.2d 1301, 1310 (Wash. 1996). To determine the parties' intent, Washington courts "follow[] the objective manifestation theory of contract interpretation, under which courts focus on the 'reasonable meaning of the contract language to determine the parties' intent' at the time they entered into the agreement." *Raab v. Nu Skin Enters., Inc.*, 536 P.3d 695, 709 (Wash. Ct. App. 2023) (quoting *Viking Bank v. Firgrove Commons 3, LLC*, 334 P.3d 116, 120 (Wash. Ct. App. 2014)). "To assist in determining the meaning of contract language," Washington courts may apply the "context rule." *Viking Bank*, 334 P.3d at 120 (citing *Berg v. Hudesman*, 801 P.2d 222, 228 (Wash. 1990)). While "this rule allows examination of the context surrounding a contract's execution," courts may only use it "'to determine the meaning *of specific words and terms used*' and not to 'show an intention independent of the instrument' or to 'vary, contradict

or modify the written word.'" *Id.* (quoting *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 115 P.3d 262, 267 (Wash. 2005)).

The Operating Agreement acknowledges Kapoustine as the inventor of the foundational technology, but it distinguishes between his preexisting prototype and future development work. The Operating Agreement stated that "[t]he primary business to be conducted by the Company shall be the development, promotion, resale and distribution of software developed by the company." Dkt. No. 47-1 at 2. It expressly clarifies that Kapoustine will develop software "based off" software that he owned "for resale." *Id.* at 2–3 The Operating Agreement repeatedly references software and algorithms owned or developed by the company. *See, e.g.*, *id.* at 3, 5. It also discusses the partners' plans for company growth, stating that "[w]hen the company matures to hiring employees, Ted will be the Chief Technology Officer, and will be required to form a team of engineers *to continue developing the solutions and software that are owned by the corporation*." *Id.* at 3 (emphasis added). This language demonstrates the parties' intent that future development work would belong to the partnership, not to Kapoustine individually.

When the parties incorporated DejaVuAI in 2022, 1st1 Technologies executed a License Agreement granting DejaVuAI "an exclusive, irrevocable, sublicensable license . . . to use, reproduce, distribute, alter, display, modify, make derivative works of, and sell the Software and Trademarks." Dkt. No. 47-5 at 3. Critically, the License Agreement provided that DejaVuAI would own any "improvements or updates" to the licensed software: "[a]ll right, title, and interest in any Improvement conceived, made, or reduced to practice by [1st1 Technologies] during the Term will

1    automatically be: (a) as between the Parties, the exclusive property of [DejaVuAI]."

2    *Id*. The License Agreement had a perpetual term with no right of termination by

3    1st1 Technologies except upon DejaVuAI's dissolution. *Id*. at 5.

4        Kapoustine's PIIAA with DejaVuAI contained the most explicit assignment

5    language. He agreed that "all inventions, original works of authorship,

6    developments, concepts, know-how, improvements or trade secrets which are made

7    by me (solely or jointly with others) within the scope of and during the period of my

8    Relationship with the Company are '***works made for hire'*** (to the greatest extent

9    permitted by applicable law) and are compensated by my salary . . . ." Dkt. No. 47-7

10   at 3–4 (emphasis in original). The PIIAA required disclosure of any "Prior

11   Inventions" Kapoustine wished to exempt from assignment, and he listed only

12   "[i]mage search recognition software" "owned by 1st1 Technology LLP and licensed

13   to the Company [DejaVuAI]." *Id*. at 9.

14       Together, these agreements establish a clear progression: Kapoustine began

15   with a prototype, more developed versions of that prototype became partnership

16   property under the 1st1 Operating Agreement, 1st1 Technologies licensed its rights

17   to DejaVuAI under the License Agreement, and Kapoustine assigned his later

18   improvements to DejaVuAI under the PIIAA. Accordingly, any DejaVuAI technology

19   he created or improved while working for DejaVuAI likely belongs to DejaVuAI.

20   **3.3    Kapoustine's challenges to the contractual framework lack merit.**

21       Kapoustine's arguments challenging DejaVuAI's ownership are unpersuasive.

22   First, he argues that he developed DejaVuAI technology alone and that it was

23

market-ready and fully functional by 2018, "well before the formation of either 1ˢᵗ1 Technologies LLP or DejaVuAI Inc." Dkt. No. 57 at 11. Even if this were true, it does not contradict DejaVuAI's claim to ownership, given the terms of the License Agreement and PIIAA.

Second, Kapoustine asserts that the PIIAA "identified his image-recognition software as a 'Prior Invention'" exempt from assignment. Dkt. No. 57 at 12. But the plain language of the PIIAA contradicts this argument. Kapoustine did not identify *his* image recognition software as a Prior Invention; rather, he identified image search software "owned by 1ˢᵗ1 Technologies LLP and licensed to [DejaVuAI Inc.]" as a Prior Invention. Dkt. No. 47-7 at 9. Thus, the PIIAA does not reflect that Kapoustine owned the software as an individual. Rather, it shows that the partnership 1ˢᵗ1 Technologies owned the software and had licensed it to DejaVuAI— consistent with the License Agreement. *See id*. The disclosure does not reflect individual ownership by Kapoustine.

Third, Kapoustine argues that he never signed the License Agreement, suggesting that DejaVuAI forged his signature. This argument is unpersuasive for several reasons. To start, Kapoustine himself referenced the License Agreement when completing the Prior Inventions disclosure, describing technology "owned by 1ˢᵗ1 Technology LLP and licensed to the Company [DejaVuAI]." Dkt. No. 47-7 at 9. Next, Kapoustine signed a Common Stock Purchase Agreement acknowledging the "Exclusive License Agreement" between 1ˢᵗ1 and DejaVuAI. Dkt. No. 47-6 at 2. These contemporaneous acknowledgments contradict his current denial. *See*

1    *Porretti v. Dzurenda*, 11 F.4th 1037, 1051 (9th Cir. 2021) ("district court may render

2    credibility determinations before deciding a motion for a preliminary injunction").

3         Fourth, Kapoustine argues that because he alone possessed the source code,

4    DejaVuAI never actually possessed it and thus lacks standing to sue under the

5    DTSA. But this argument fails because Kapoustine possessed the code as

6    DejaVuAI's CTO, a high-ranking agent of the corporation. Thus, the Court finds

7    that DejaVuAI possessed the source code through Kapoustine, its agent and

8    employee. *See State v. Brelvis Consulting LLC*, 436 P.3d 818, 824 (Wash. Ct. App.

9    2018) ("By necessity [a corporation] acts through its officers, directors, employees,

10   and other agents.") (quotation omitted).

11        Fifth, Kapoustine argues that DejaVuAI never legally employed him, relying

12   on immigration law arguments about the validity of his O-1 visa. But Kapoustine

13   signed an employment contract and PIIAA with DejaVuAI, and USCIS approved

14   DejaVuAI as his petitioning employer. *See generally* Dkt. Nos. 47-7; 47-8; 47-9; 47-

15   10. Kapoustine argues that USCIS incorrectly granted the petition based on false

16   information provided by DejaVuAI. *See generally* Dkt. No. 58 (declaration of

17   attorney Michael Jacobson). Both Parties submitted declarations from attorneys

18   specializing in corporate immigration law to support their arguments on this point.

19   Dkt. Nos. 49; 58. In the end, USCIS granted Kapoustine an O-1 visa with DejaVuAI

20   as his employer, and Kapoustine cites no precedent suggesting that the Court may

21   invalidate an approved USCIS petition in a trade secrets dispute.

22        Sixth, Kapoustine claims that he never improved the software or created

23   subsequent versions of it when he worked for DejaVuAI, arguing that since the

1    License Agreement and PIIAA only assign improved versions, there are no

2    improved versions for DejaVuAI to own. The Court finds Kapoustine's claim

3    doubtful based on the record. As detailed above, the various contracts show that

4    Kapoustine and Kessler went into business together to develop and sell the software

5    that would become DejaVuAI technology. And a declaration from Kessler asserts

6    that "Mr. Kapoustine continued developing DejaVuAI's products in his capacity as

7    CTO." Dkt. No. 65 at 4. Kapoustine "created versions that were significantly more

8    stable and functional and solved many issues like memory leaks by 'refactoring' the

9    software multiple times." *Id*. The Court rejects the idea that Kapoustine did not

10   update or improve the technology while he was employed—for nearly three years—

11   as DejaVuAI's CTO.

12         Seventh, Kapoustine argues that DejaVuAI failed to take reasonable

13   measures to protect the alleged trade secret, undermining its ownership claim.

14   Under the DTSA, a plaintiff must show that it took "reasonable measures to keep

15   such [trade secret] information secret." 18 U.S.C. § 1839(3)(A). Reasonable

16   measures can include policies like "requiring employees to sign confidentiality

17   agreements, disclosing the trade secrets to employees only on a need-to-know basis,

18   and password-protecting the information." *Wixen Music UK Ltd. v. Transparence

19   Ent. Grp. Inc.*, Case No. 2:21-cv-02663, 2021 WL 6065690, at *7 (C.D. Cal. Dec. 22,

20   2021). DejaVuAI satisfied this obligation by requiring Kapoustine "to keep [the code

21   and algorithms] confidential and only use them for the Company's benefit," under

22   the PIIAA. Dkt. No. 53 (reply brief) (citing Dkt. No. 47-7 at 1); *see also* Dkt. No. 11

23   at 3 (explaining Kapoustine and Kessler "both signed employment contracts with

the Company which contain, among other things, confidentiality and multiple non-solicitation covenants"). That Kapoustine, as CTO, controlled access to the code and algorithms does not undermine DejaVuAI's secrecy measures, it reflects them.

### 3.3.1   DejaVuAI will likely establish the remaining elements of its DTSA claim.

The DTSA defines "misappropriation" of trade secrets as, among other things, "disclosure or use of a trade secret of another without express or implied consent by a person who" "used improper means to acquire knowledge of the trade secret" or "acquired [the trade secret] under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5). "[A]ny exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant is a 'use' under this Section." *JustMed, Inc. v. Byce*, 600 F.3d 1118, 1130 (9th Cir. 2010) (quoting Restatement (Third) of Unfair Competition § 40, cmt. c (1995) (citation omitted)). "[M]arketing goods that embody the trade secret, employing the trade secret in manufacturing or production, relying on the trade secret to assist or accelerate research or development, or soliciting customers through the use of information that is a trade secret all constitute 'use.'" *Id.* (quoting Restatement (Third) of Unfair Competition § 40, cmt. c (1995) (citation omitted)).

Kapoustine does not dispute that he has used DejaVuAI source code—he effectively acknowledges that he has used DejaVuAI's source code and algorithms "to assist or accelerate [his] research or development." *See JustMed, Inc.*, 600 F.3d at 1130. He states that he has "made many exciting changes to Photon ES," Dkt No.

13-1, and describes "a new release of Photon ES that has many features added and enabled and many bugs fixed," Dkt. No. 13-2. This constitutes "use." Kapoustine's arguments to the contrary are based on his contention that he owns the software and cannot misappropriate technology that he owns. But the Court has already rejected his ownership argument. Accordingly, DejaVuAI will likely establish that Kapoustine misappropriated its trade secrets.

As for the final element—actual or threatened damage—DejaVuAI is likely to establish that as well. Kapoustine admittedly intends to use updated versions of DejaVuAI's software to compete with the company. *See* Dkt. No. 42 at 8 ("Mr. Kapoustine, based on his DejaVuAI technology, is capable of developing improved and more affordable software, including consumer-facing applications. He needs and should have the right to market his own products and make money out of it."). This establishes the threatened damage element.

The company has thus shown a likelihood of success on its DTSA claim.

### 3.4 The Court does not address DejaVuAI's amended arguments on fiduciary duty.

The Court initially granted the TRO based on its finding that DejaVuAI was likely to succeed on its breach-of-fiduciary-duties claim. Dkt. No. 21 at 6. That finding rested on Kapoustine's role on the company's board of directors. Since the TRO issued, however, Kapoustine has resigned from the board.

Kapoustine now argues that Washington law imposes no fiduciary duties on him, and thus the Court should not convert that aspect of the TRO into a preliminary injunction. Namely, it should not prohibit him from competing with

DejaVuAI. DejaVuAI responds that Kapoustine still owes it fiduciary duties because he remains an owner and manager with a right of control over its controlling majority shareholder, 1st1 Technologies.

Given the Court's conclusion that DejaVuAI will likely succeed on its DTSA claim, the Court need not address DejaVuAI's amended breach-of-fiduciary-duty arguments. *See Versaterm Inc. v. City of Seattle*, C16-1217-JLR, 2016 WL 4793239, at *5 (W.D. Wash. Sept. 13, 2016) ("Where a party asserts multiple claims, the court need not find that the plaintiff is likely to succeed on the merits of all of the plaintiff's claims to issue a preliminary injunction."). The DTSA claim provides sufficient basis for the requested relief.

**3.5    Irreparable Harm.**

The plaintiff "must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief." *Winter*, 555 U.S. at 21. Typically, economic injury does not constitute irreparable harm because it can be compensated by an award of money damages. *Potlongo v. Herff Jones*, LC, 749 F. App'x 537, 538 (9th Cir. 2018) (citing *Rent-A-Center, Inc. v. Canyon Television and Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). However, "intangible injuries, such as damage to ongoing recruitment efforts and goodwill, qualify as irreparable harm." *Rent-A-Center, Inc.*, 944 F.2d at 603. To assert one of these intangible irreparable harms, the plaintiff must produce evidence that establishes the harm's irreparable nature and imminence. The evidence may not be speculative. *Pom Wonderful LLC v. Pur Beverages LLC*, Case No. CV 13–06917, 2015 WL 10433693,

at *5 (C.D. Cal. Aug. 6, 2015) (citing *Caribbean Marine Servs. Co., Inc. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988)).

The Court previously concluded that the evidence established concrete, irreparable harm to DejaVuAI's business relationships and reputation. Dkt. No. 21 at 8–9. The Court incorporates its prior findings here.

District courts in the Ninth Circuit often conclude that "[a]n intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost always certainly show irreparable harm." *Pac. Aerospace & Elecs., Inc. v. Taylor*, 295 F. Supp. 2d 1188, 1198 (E.D. Wash. 2003) (quoting *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92–93 (3rd Cir.1992)). If permitted to continue his misappropriation of trade secrets here, Kapoustine would cause irreparable harm to DejaVuAI by setting back its position in the market while creating an unfair competitive advantage for himself. *See WeRide Corp. v. Kun Huang*, 379 F.Supp.3d 834, 855 (N.D. Cal. 2019) ("Without an injunction, WeRide is likely to have its market position set back as AllRide and ZZX receive an unfair boost.").

The evidence shows Kapoustine has told DejaVuAI employees that "there is a new release of Photon ES that has many features added and enabled and many bugs fixed," but he reiterated that he wouldn't share it with the company unless it agreed to sign a new license agreement with him. Dkt. No. 13-2 at 2. And he encouraged a DejaVuAI investor to cut ties with the company, asserting it would "die naturally" because he alone possesses and updates the software. *See* Dkt. No. 11-12 at 5.

1    DejaVuAI has also submitted evidence showing that Kapoustine has

2    threatened to destroy, publish, and sell its trade secrets. Dkt. No. 47 at 8. Any of

3    these actions would result in the loss of trade secrets and thus irreparable harm to

4    DejaVuAI. Under these circumstances, the Court finds it likely that DejaVuAI will

5    face irreparable harm to its business that cannot be compensable through money

6    damages later.

7    **3.6    Balance of the Equities and Public Interest.**

8        Before issuing a preliminary injunction, "courts must balance the competing

9    claims of injury and must consider the effect on each party of the granting or

10   withholding of the requested relief." *Winter*, 555 U.S. at 24. They must also "pay

11   particular regard for the public consequences in employing the extraordinary

12   remedy of injunction." *Id*.

13       The balance of the equities favors an injunction. The Court has already found

14   that DejaVuAI faces concrete and irreparable harms if Kapoustine continues his

15   likely unlawful conduct. Conversely, Kapoustine argues that he will suffer financial

16   harm if he is not permitted to compete with Plaintiff using DejaVuAI technology, or

17   technology derived from it. But "harm caused by illegal conduct does not merit

18   significant equitable protection," *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d

19   848, 867 (9th Cir. 2017), and the Court has concluded that Kapoustine's actions

20   likely constitute unlawful misappropriation of DejaVuAI's trade secrets.

21       Additionally, Kapoustine is a skilled software engineer who has worked for

22   several prominent technology companies in the United States. He almost certainly

23

1
2
3

has other employment opportunities unrelated to DejaVuAI technology; he does not assert an inability to work elsewhere on different software. Balancing the harms, the Court finds that the harms to DejaVuAI outweigh the harms to Kapoustine.

4
5
6
7
8
9
10
11

The public interest also favors an injunction. When a plaintiff alleging trade secret misappropriation establishes the first three *Winter* factors, "it follows that the public's interest in these circumstances favors an injunction specifically focused on [the defendant's] use of any misappropriated trade secrets." *Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1210 (E.D. Cal. 2020) (internal quotes omitted). The Court finds that enjoining Kapoustine's misappropriation of the source codes or algorithms for the products identified below is in the public interest. *See Cutera, Inc.*, 444 F. Supp. 3d at 1210.

## 4. CONCLUSION

12
13
14
15

Kapoustine does not dispute that the following terms of the Court's TRO should convert to a preliminary injunction. Accordingly, the Court ORDERS that Kapoustine is ENJOINED from:

16
17
18
19

(a) Contacting any of DejaVuAI's current and prospective customers, resellers, licensors, vendors, or other business contacts whom he is aware of by virtue of his former DejaVuAI employment or his position as a director of the Company;

20
21
22
23

(b) Engaging in any form of conduct or making statements or representations that disparage, portray in a negative light, or otherwise impair the reputation or commercial interest of DejaVuAI, its officers and directors, its investors, or its products and services;

(c) Taking any action to directly or indirectly interfere with DejaVuAI's operations, including any conduct to disrupt, alter, or otherwise affect any digital services or infrastructure that DejaVuAI currently uses to operate or market its business.

Based on its findings above, the Court FURTHER ORDERS that Kapoustine is ENJOINED from:

(d) Disclosing or using DejaVuAI's trade secrets. Prohibited actions include but are not limited to marketing, selling, attempting to market or sell, utilizing in research or development, or otherwise doing or attempting to do business with respect to DejaVuAI's trade secrets or any product or service based upon, derived from, or incorporating DejaVuAI's trade secrets. DejaVuAI's trade secrets include any non-public source codes and non-public algorithms underlying these programs:

| Product Name | Edition | Operating Systems |
|---|---|---|
| Photon | Standard | MacOS, Linux, Windows |
| Photon | Founder's Edition | MacOS, Linux, Windows |
| PhotonServer | Standard | MacOS, Linux, Windows |
| Matcher | Standard | MacOS, Linux, Windows |
| Watcher Client | Standard | MacOS, Linux, Windows |
| Watcher Test | Standard | MacOS, Linux, Windows |
| MapSearch | Standard | MacOS, Linux, Windows |
| PhotonES | Enterprise | MacOS, Linux, Windows |
| PhotonES Client | Enterprise | MacOS, Linux, Windows |
| PhotonES Broker | Enterprise | MacOS, Linux, Windows |

| Product Name | Edition | Operating Systems |
|---|---|---|
| PhotonES Dealer | Enterprise | MacOS, Linux, Windows |
| PhotonES Handler | Enterprise | MacOS, Linux, Windows |
| PhotonES Searcher | Enterprise | MacOS, Linux, Windows |
| ProductReco | Standard | MacOS, Linux, Windows |
| LogoReco | Standard | MacOS, Linux, Windows |
| PhotonFrameExtractor | Standard | MacOS, Linux, Windows |

No security bond is required under Federal Rule of Civil Procedure 65(c) because Kapoustine faces no realistic likelihood of harm from enjoining his conduct. *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003). This Preliminary Injunction will remain in effect until the Court orders otherwise or until this case is resolved.

Dated this 17th day of September, 2025.

Jamal N. Whitehead
United States District Judge